James A. Morris, Esq. (CSBN 296852)
jmorris@jamlawyers.com
Shane E. Greenberg, Esq (CSBN 210932)
sgreenberg@jamlawyers.com
**MORRIS LAW FIRM**
4001 W. Alameda Avenue, Suite 208
Burbank, California 91505
Telephone: (747) 283-1144
Facsimile: (747) 283-1143

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Amanda Sue Sellers, Nadine Quate Francis, Thomas Benton Harang, Jr., and Ian Michael Scott**, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> **Kia America, Inc., Hyundai Motor America**, **Hyundai America Technical Center, Inc.,** <br><br> *Defendants.* | Civil Action No. 8:22-cv-2065 <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Amanda Sue Sellers, Nadine Quate Francis, Thomas Benton Harang, Jr., and Ian Michael Scott (collectively, "Plaintiffs"), individually and on behalf of all those similarly situated, bring this complaint against Defendants Kia America, Inc., Hyundai Motor America, and Hyundai America Technical Center, Inc. (collectively, "Defendants"), based upon their personal knowledge as to facts specific to them and based upon the investigation of counsel, as follows:

1
**CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND**

# I.   NATURE OF THIS ACTION

1.      Plaintiffs bring this proposed class action for damages and injunctive relief on behalf of themselves and all others nationwide who purchased or leased vehicles manufactured by Defendants (hereinafter "Class Vehicles")[1] that have been stolen and/or suffered reduced economic value due to a series of defects in the vehicles that make them prone to theft.

2.      The vehicles at issue suffer from several design flaws that make them easy to steal in less than ninety seconds. The most serious design flaw is the lack of engine immobilizers in the vehicles. Engine immobilizers are simple anti-theft devices that prevent vehicles from starting unless a verified code is received by a transponder module that controls the engine. Immobilizers cost manufacturers only approximately $50 per vehicle, yet, unlike other car manufacturers, Defendants herein chose to stop including immobilizers in their vehicles years ago.[2]

3.      As a result of these defects, the theft of Class Vehicles has skyrocketed compared to vehicles manufactured by other companies. Viral videos on TikTok and YouTube give step-by-step instructions on how to steal Class Vehicles without a key. In fact, the "Kia Challenge," widely shared on social media platforms, dares people to break in and use a USB cord to start the cars. The videos show teens and young adults going for joy rides and, in some cases, abandoning or crashing the cars.

4.      Defendants have long known or should have known of these defects from multiple sources, yet only acknowledged the defects in recent months. Defendants have still

---

[1] Upon information and belief, the Class Vehicles at issue include 2011–2022 Kia vehicles and 2015–2022 Hyundai vehicles.

[2] Other defects include windows without alarms that can be easily knocked off their frames, steering columns without adequate security casings, ignition lock cylinders that can be easily removed, and exposed ignition switches that can be easily started with pliers or USB connectors.

**COMPLAINT AND JURY TRIAL DEMAND**

failed to issue a safety recall, provide warranty coverage, or otherwise attempt to remedy the defects.

5. As a result, Plaintiffs and Class members have incurred damages, including, but not limited to, loss of value, loss of use of their vehicles, repair costs, and increased insurance premiums.

6. Plaintiffs bring this action to redress Defendants' ongoing misconduct. Plaintiffs seek an adequate remedy for the defects, recovery of damages, repair under state consumer-protection statutes and implied warranties, and reimbursement of all expenses incurred that were caused by the defects.

## II.   JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and because this is a class action in which the Class members and Defendants are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants transact substantial business in this district and because Hyundai Motor America and Kia America, Inc. are headquartered in this district. A substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## III.   PARTIES

### A.   Plaintiffs

9. Plaintiff Amanda Sue Sellers is an Illinois citizen who lives and resides in Peoria, Illinois. Plaintiff Sellers purchased a Hyundai Veloster Base Model in 2018. Plaintiff Sellers' factual allegations are set forth in Section V below.

---

3
**COMPLAINT AND JURY TRIAL DEMAND**

10.     Plaintiff Nadine Quate Francis is a Virginia citizen who lives and resides in Henrico, Virginia. Plaintiff Francis purchased a Kia Forte in August 2019. Plaintiff Francis's factual allegations are set forth in Section V below.

11.     Thomas Benton Harang, Jr. is a Louisiana citizen who lives and resides in New Orleans, Louisiana. Plaintiff Harang purchased a Hyundai Elantra in March 2019. Plaintiff Harang's factual allegations are set forth in Section V below.

12.     Ian Michael Scott is a Louisiana citizen who lives and resides in New Orleans, Louisiana. Plaintiff Scott purchased a Hyundai Sonata in December 2020. Plaintiff Scott's factual allegations are set forth in Section V below.

**B. <u>Defendants</u>**

13.     Defendant Kia America, Inc. is a California corporation with its principal place of business in Irvine, California.

14.     Defendant Hyundai Motor America is a California corporation with its principal place of business in Fountain Valley, California.

15.     Hyundai was incorporated in 1986 by its Korean parent entity, Hyundai Motor Company ("HMC"), as the latter's first venture into the American market. When it first arrived on American soil, Hyundai sold a single model car to its new consumers: the Hyundai Excel.

16.     Kia Motors America, Inc. was incorporated in 1992 as the American sales, marketing, and distribution arm of its parent corporation, Kia Motor Corporation ("KMC"), a Korean–based auto manufacturer. Kia Motors America, Inc. changed its name to Kia America, Inc. in 2021.

17.     KMC filed for bankruptcy during the 1997 Asian financial crisis, and the following year it reached an agreement with HMC for the latter to acquire a 51% ownership interest in the company.

---

**COMPLAINT AND JURY TRIAL DEMAND**

18.     HMC remains the majority shareholder of KMC, with its ownership stake now standing at approximately one-third of the company.

19.     Hyundai began manufacturing vehicles in the United States in 2002, when it opened a manufacturing plant located in Montgomery, Alabama, where the company assembles a number of models, such as the Hyundai Sonata, Elantra, and Santa Fe.

20.     Kia began manufacturing vehicles in the United States in 2010 at a manufacturing facility in West Point, Georgia, where it manufactures several of the company's most popular models, including the Kia Optima, Sorento, and Telluride.

21.     Hyundai America Technical Center, Inc. ("HATCI") is the design, engineering, and development center for all Kia and Hyundai vehicles sold in the North American market.[3]

22.     Because HATCI serves as the technological arm of Kia and Hyundai's Korean-based parent corporations, virtually all Kia and Hyundai vehicles sold in the United States, including the Class Vehicles, feature the same or similar design elements throughout their respective product lines.

23.     HATCI also serves as an "authorized representative" of both HMC and KMC in North America to ensure these manufacturers' compliance with the National Traffic and Motor Vehicle Safety Act (the "Safety Act"); in this capacity, HATCI regularly interacts with the National Highway Traffic Safety Administration ("NHTSA") to ensure compliance with the administration's regulatory mandates.

---

[3] *See About Us*, https://hatci.com/about/ ("HATCI HQ is the nucleus for designing, planning and overall development of Hyundai and KIA vehicles tailored for the North American market.") (last visited Sept. 14, 2022); *Our Capabilities*, https://hatci.com/services/ (last visited Sept. 14, 2022).

24.     Hyundai, in conjunction with HATCI, is responsible for the manufacture, design, distribution, service, and repair of the company's vehicles that are sold to its American consumers.

25.     Kia, in conjunction with HATCI, is responsible for the manufacture, design, distribution, service, and repair of the company's vehicles that are sold to its American consumers.

## IV.     FACTUAL ALLEGATIONS

### A.  Auto theft is a safety risk.

26.     In 1966, Congress enacted the Safety Act to empower the federal government to set and administer new safety standards for motor vehicles and road traffic safety.

27.     The Safety Act created a new federal agency, the U.S. Department of Transportation ("DOT"), and various subsidiary administrative agencies, including NHTSA, an organization whose mission is "to save lives, prevent injuries, and reduce economic costs due to road traffic crashes, through education research, safety standards, and enforcement."[4]

28.     Pursuant to its authority under the Safety Act, NHTSA has promulgated numerous Federal Motor Vehicle Safety Standards ("Safety Standards" or "FMVSS"), *see* 49 C.F.R. § 571.101 *et seq.*, which the Safety Act defines as the "minimum standard for motor vehicle or motor vehicle equipment performance."[5]

---

[4] *Working at NHTSA*, https://www.nhtsa.gov/about-nhtsa/working-nhtsa (last visited Oct. 31, 2022).
[5] 49 U.S.C. § 30102(a)(10).

29.     One of the Safety Standards that NHTSA enacted is FMVSS 114, which decreed minimum theft–protection standards that virtually all passenger vehicles in the United States are required to follow.[6]

30.     FMVSS 114 was promulgated in April 1968. The Administrator's comments supporting the need for this Safety Standard explain that "stolen cars constitute a major hazard to life and limb on the highways."[7]

31.     In reaching this conclusion, the Administrator summarized a body of evidence, which demonstrated that "cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[8]

32.     Indeed, after further explaining the findings of a Department of Justice study (the "1968 DOJ Study") about the increased safety risk stolen vehicles pose, the Administrator explained that "the approximate [accident] rate for stolen cars would be some 200 times the normal accident rate for other vehicles."[9]

33.     Given the increased safety risk posed by the unauthorized use of motor vehicles, the Administrator "reject[ed] those comments on the proposed standard which questioned its validity on the ground that [FMVSS 114 was] not related to improving motor vehicle safety."[10]

---

[6] See 49 C.F.R. § 571.114 ("Theft protection and rollaway prevention.").
[7] 33 Fed. Reg. 6,471 (Apr. 27, 1968).
[8] Id.
[9] Id.
[10] Id.

**COMPLAINT AND JURY TRIAL DEMAND**

34.     FMVSS 114 thus sought to curb the ease with which vehicles could be stolen by promulgating minimum standards that required "each car [ ] be equipped with a device to remind drivers to remove the key when leaving the car."[11]

35.     Certain comments rejected the utility of this proposed Safety Standard, contending that "since any locking system, no matter how it is constructed, can be defeated by persons possessing sufficient skill, equipment, and tenacity, provisions for ensuring removal of ignition keys would be futile because a thief need not make use of a key."[12]

36.     The Administrator rejected these contentions, however, by again relying on the 1968 DOJ Study, which concluded that "the large majority of car thieves are amateurs, almost half of whom are engaged in so-called 'joy-riding.'"[13] This evidence, the Administrator explained, "shows that a high proportion of these thieves, most of whom are juveniles, start the cars' engines simply by using the key which has been left in the ignition lock."[14]

37.     Thus, FMVSS 114 also required manufacturers to use "[a] large number of locking-system combinations" for the keys on each vehicle's model line as well as "a steering or self-mobility lock."[15] All told, the first iteration of FMVSS 114 read in pertinent part as follows:

S.4 *Requirements.*

S4.1 Each passenger car shall have a key-locking system that, whenever the key is removed, will prevent—
(a) Normal activation of the car's engine or other main source of motive power; and
(b) Either steering or self-mobility of the car, or both.

---

[11] Id.
[12] Id.
[13] Id.
[14] Id.
[15] Id.

S4.2 The prime means for deactivating the car's engine or other main source of motive power shall not activate the deterrent required by S4.1(b).

S4.3 The number of different combinations of the key locking systems required by S4.1 of each manufacturer shall be at least 1,000, or a number equal to the number of passenger cars manufactured by such manufacturer, whichever is less.

S4.4 A warning to the driver shall be activated when the key required by S4.1 has been left in the locking system and the driver's door is opened.[16]

38.     Although FMVSS 114 has been updated to "better correlate[ ] to modern theft protection technology and reflect[ ] the agency's interpretation of existing requirements[,]" it has not substantively changed the minimum performance requirements for antitheft equipment. Specifically, "the standard [seeks] to ensure that [a] vehicle could not be easily operated without the key, and that the vehicle operator would not forget to remove the key from the ignition system upon exiting the vehicle."[17]

39.     In other words, FMVSS 114 was promulgated to prevent easy cases of auto-theft, whereby unsophisticated car thieves can easily steal vehicles because either the keys are left in the vehicle's ignition or, as is this case with the Class Vehicles, the vehicle could be easily operated without the key.

40.     In its current form, FMVSS 114 requires manufacturers, including Kia and Hyundai, to outfit their vehicle lines according to the following specifications:

S4. Definitions.

…

Key means a physical device or an electronic code which, when inserted into the starting system (by physical or electronic means), enables the vehicle operator to activate the engine or motor.

…

---

[16] *Id.* at 6,472 (emphasis in original).
[17] *See* 71 Fed. Reg. 17,752, 17,753 (Apr. 7, 2006).

**COMPLAINT AND JURY TRIAL DEMAND**

Starting system means the vehicle system used in conjunction with the key to activate the engine or motor.

…

S5.1 Theft protection.

S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:

(a) The normal activation of the vehicle's engine or motor; and

(b) Either steering, or forward self-mobility, of the vehicle, or both.[18]

41.     Apart from its promulgation of FMVSS 114, NHTSA oversees other regulatory schemes to identify and combat vehicle theft in the United States, including the motor vehicle theft prevention standard, *see* 49 C.F.R. § 541.1 *et seq.*, as promulgated pursuant to its authority under the Motor Vehicle Theft Act of 1984 (the "Theft Act"), which was engrafted onto the Safety Act.[19]

42.     Pursuant to the theft prevention standard, NHTSA ensures that auto manufacturers comply with the "parts–marking requirement" ("PMR"): where auto manufacturers mark major parts of passenger vehicles with non-removable labels that make these parts identifiable if stolen.[20] The PMR is another regulatory scheme to combat auto theft; not only do marked auto parts facilitate their tracing and recovery, but they also serve as evidence used to prosecute thieves, dealers, and chop shops connected with vehicle theft.[21]

---

[18] 49 C.F.R. § 571.114.

[19] *See* 69 Fed. Reg. 17,960 (Apr. 6, 2004).

[20] *Id.*

[21] *Id.* at 17,961.

43.     Auto manufacturers can be exempt from complying with the PMR if a manufacturer installs an antitheft device as standard equipment on a given vehicle line which NHTSA determines to be at least as effective as the PMR.[22]

44.     Historically, NHTSA has also published annual compilations concerning rates and trends of auto theft; in connection with compiling this data, NHTSA regularly sought comment from auto manufacturers and other interested parties regarding auto theft trends.[23] NHTSA's annual reports are based on information it receives from the National Crime Information Center ("NCIC"), a division of the Federal Bureau of Investigation.[24]

45.     In connection with fulfilling its administrative mandate under both the Safety Act and the Theft Act, NHTSA regularly interacts with, seeks comment from, and shares information with, automotive manufacturers and their authorized representatives, including Defendants.

**B.   Kia and Hyundai tout themselves as innovative car companies committed to keeping their customers safe.**

46.     Kia and Hyundai have become a growing force in the U.S. auto market by positioning themselves as providing an incredible value proposition to U.S. consumers. They offer various lines of vehicles at cheaper prices than their competitors and claim they are nonetheless loaded with standard features and innovative design and backed by industry-leading warranties.

47.     The brands have also staked their reputation to a critical consideration that virtually every automotive consumer holds dear: vehicle safety.

---

[22] *Id.*; *see also* 49 C.F.R. § 543.1 *et seq.*
[23] *See, e.g.*, 75 Fed. Reg. 11,005, 11,006 (Mar. 10, 2010).
[24] *Id.* at 11,006.

48.     According to its website, for example, Kia works "tirelessly to ensure [its] vehicle safety features are designed to help [its] drivers handle or avoid the unexpected."[25]

49.     Similarly, in a March 2021 interview, Kia's CEO stated that "[w]hile [Kia] continue[s] to raise the bar in terms of design, value, and technology, safety is always at the forefront."[26]

50.     Kia's various brochures for its 2020 lineup echo its CEO's sentiments, claiming that "[a]t Kia, the priority is always on improving all aspects of safety … we never stop working to increase your protection."[27]

51.     Indeed, the company credits the success of its brand to its "design innovation, quality, value, advanced safety features, and new technologies."[28]

52.     In short, for more than a decade, Kia's marketing and advertising materials—that it disseminates through various media to consumers in connection with promoting the sales of its vehicles—have consistently reiterated its ostensible commitment to innovative design, customer safety, and its stellar warranty program.

53.     Similar to its corporate cousin, Hyundai claims that its customers are always at the forefront of the company's thoughts. According to Hyundai, its customers are "at the heart of everything" the company does.[29]

---

[25] *Why Kia*, https://www.kia.com/us/en/why-kia (last visited Sept. 14, 2022).

[26] Kia Motors America, *Kia Among Brands With Most 2021 IIHS Top Safety Pick Plus And Top Safety Pick Vehicles With Eight Awards*, CISION PR NEWSWIRE, https://www.prnewswire.com/news-releases/kia-among-brands-with-most-2021-iihs- top-safety-pick-plus-and-top-safety-pick-vehicles-with-eight-awards-301238259.html (Mar. 2, 2021).

[27] *Optima. For Taking a Bold Direction.*, DEALER EPROCESS, https://cdn.dealereprocess.org/cdn/brochures/kia/2020-optima.pdf (last visited October 31, 2022).

[28] James Hope, *2012 Kia Optima and Kia Soul Ranked Highest in Class in J.D. Power and Associates Appeal Study*, KIA MEDIA, https://www.kiamedia.com/us/en/media/pressreleases/3924/2012-kia-optima-and-kia-soul- ranked-highest-in-class-in-jd-power-and-associates-appeal-study (July 25, 2012).

**COMPLAINT AND JURY TRIAL DEMAND**

54.     Hyundai's vehicle brochures profess that "[s]afety is a mindset," which, according to the company, "starts with a car's core engineering."[30] As such, Hyundai maintains that it has "made huge investments into making [its] vehicles among the safest on the road."[31]

55.     Various brochures and pronouncements on Hyundai's website, which it distributes and displays to its consumers throughout the United States, likewise reflect the company's ostensible commitment to safety, engineering, and customer satisfaction—corporate virtues to which Hyundai credits its success.

56.     Offerings such as this are why Hyundai has represented to the public that regardless of the vehicle a consumer buys, there is a common thread across all its vehicle lines: "value for money and low cost to own are truly characteristic of the Hyundai experience."[32]

57.     Despite their representations to the contrary, however, Defendants have knowingly flooded the market with defective vehicles equipped with purported anti-theft systems that violate both the letter and spirit of FMVSS 114; Defendants have engaged in

---

[29] James Hope, Hyundai Motor America and Kia Motors America Resolve Engine Litigation, KIA MEDIA, https://www.kiamedia.com/us/en/media/pressreleases/15457/hyundai-motor-america-and-kia-motors-america- resolve-engine-litigation (Oct. 10, 2019).
[30]      *2013      Hyundai      Sonata*,      DEALER      EPROCESS, https://cdn.dealereprocess.org/cdn/brochures/hyundai/2013-sonata.pdf (last visited October 31, 2022).
[31]      *2013      Hyundai      Full      Line*,      AUTO-BROCHURES,      https://www.auto-brochures.com/makes/Hyundai/Hyundai_US%20Full_Line_2013.pdf (last visited October 31, 2022).
[32] Jim Trainor, *Three Hyundai Models Awarded 5–Year Cost to Own Accolade by Kelley Blue Book's KBB.com*,      HYUNDAI      MOTOR      COMPANY, https://www.hyundai.com/worldwide/en/company/newsroom/three-hyundai-models-awarded-5- year-cost-to-own-accolade-by-kelley-blue-book%27s-kbb.com-0000001568 (Feb. 5, 2013).

13
**COMPLAINT AND JURY TRIAL DEMAND**

conduct that has been catastrophic to the welfare of thousands of residents across the United States and have no intention to fix the defects.

**C. Data proves that immobilizers reduce theft.**

58.     Immobilizers have been proven to deter auto theft. Indeed, a 2016 study reflects that the use of immobilizers lowered the overall rate of car thefts by 40% over a ten-year period.[33]

59.     Immobilizers are an electronic security device that make it virtually impossible to start a vehicle without a key unless the vehicle's computer has been altered.

60.     Recognizing the value of immobilizers as an anti-theft device, countries across the globe require immobilizers to be installed as standard equipment in new vehicles. For example, the European Union has required immobilizers as a standard feature for all new vehicles since 1998, Australia since 2001, and Canada since 2007.[34]

61.     In 1997, NHTSA entertained a petition to amend FMVSS 114 to follow suit and require manufacturers to install immobilizers as standard technology in all new vehicle lines.[35]

62.     NHTSA ultimately denied the petition, explaining that the Safety Act's definition of "motor vehicle safety standard" limited its discretion to impose design criteria (as opposed to performance criteria) on the manufacturers it oversees:

> Although NHTSA is interested in actions that would reduce motor vehicle theft and provide for a safer and more effective means of deterring theft than that presently offered by steering lock systems, the definition of "motor vehicle safety standard" in the vehicle safety law, 49 U.S.C. 30102(9), provides that a safety standard is "a minimum standard for motor vehicle or motor

---

[33] Jan C. van Ours & Ben Vollaard, *The Engine Immobilizer: A Non–Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 1264, 1283 (2016).
[34] *Id.* at 1265.
[35] *See* 62 Fed. Reg. 54,152, 54,153 (Oct. 17, 1997).

**COMPLAINT AND JURY TRIAL DEMAND**

vehicle equipment performance." This definition limits the agency's discretion with respect to petitions that seek to specify the design of vehicles or equipment rather than their performance. This prohibits the agency from mandating specific technologies that motor vehicle manufacturers are to use to deter theft, as the CARS petition requests.[36]

63.     Although it denied this petition, NHTSA explained that pursuant to its authority under the Theft Act: (i) manufacturers "may petition the agency for an exemption from the [PMR] if an antitheft device is installed as standard equipment on the entire vehicle line"; (ii) "[s]ome manufacturers have already developed and installed antitheft devices which utilize specific ignition keys and sophisticated electronic control modules similar to that required by the European Union [i.e., an immobilizer]"; and (iii) NHTSA had already "granted exemptions from parts marking under 49 CFR part 543 for models equipped with PASS-KEY and other antitheft devices with computer chips imbedded in the ignition key."[37]

64.     Thus, for more than 25 years, NHTSA has incentivized manufacturers to outfit their vehicles with immobilizers; technology it has repeatedly found to exceed the "minimum standard" for antitheft performance specified under FMVSS 114.[38]

65.     Under the current regulatory scheme, all "passenger vehicles" and "multipurpose passenger vehicles" with a gross vehicle weight rating of 6,000 or less (i.e., SUVs), amongst others, must either comply with the PMR or seek an exemption by establishing that they will install as a standard feature across a given model line: (i) an immobilizer that also meets the performance requirements under Canadian or EU law; or (ii) some other antitheft device that is at least as effective as the PMR in deterring theft.[39]

---

[36] *Id.* at 54,153.
[37] Id.
[38] Id.
[39] *See* 49 C.F.R. §§ 543.6–543.7.

**COMPLAINT AND JURY TRIAL DEMAND**

**D.  The Class Vehicles have design defects that make them easy to steal.**

66.     Although Defendants claim that their respective vehicles "meet or exceed Federal Motor Vehicle Safety Standards,"[40] including FMVSS 114, approximately 5,700 stolen vehicles (and counting) tell a different story.

67.     The vehicles are defective in that, among other things, Defendants manufactured and designed them without engine immobilizers.

68.     This means that all a thief needs to do to steal one of the Defective Vehicles is remove a thin piece of plastic that covers the ignition column, exposing a fragile component that can also easily be removed. The thief can then stick a USB drive, a knife, or something that fits in the resulting hole to start the vehicle without a key or electronic signal from a key.

69.     Once in the car, thieves can have the car running and drive away in under 1–2 minutes.[41]

70.     All told, these design flaws have made many Kias and Hyundais the preferred choice for auto thieves, including the Kia Boyz.

71.     The Kia Boyz wreak havoc in metropolitan Milwaukee given the ease with which the Class Vehicles can be stolen; a problem that—as NHTSA ominously explained when it enacted FMVSS 114 more than fifty years ago—creates a marked public safety threat to anyone in the vicinity of those engaging in reckless joyriding.

---

[40] *See* Winnie Dortch, *Milwaukee aldermen urge Kia and Hyundai to ramp up security features on their cars*, CBS 58 WDJT-MILWAUKEE, https://www.cbs58.com/news/milwaukee-aldermen-urge-kia-and-hyundai-to-ramp-on-security-features-on-their-cars (Jun. 17, 2021, 3:58 PM) (Kia); *see also* Jenna Sachs, *Kia, Hyundai thefts expensive for victims*, FOX6 NEWS MILWAUKEE, https://www.fox6now.com/news/kia-hyundai-thefts-expensive-milwaukee (Nov. 1, 2021, 9:12 PM) (Hyundai).

**COMPLAINT AND JURY TRIAL DEMAND**

72.     For   instance,   a   video   posted   to   an   Instagram   account   on September 11, 2021—which was, on information and belief, filmed outside of a high school—features several stolen Kias and Hyundais drag racing on the sidewalk.[42]

73.     Another video posted to Instagram on October 19, 2021, on information and belief, features a stolen Hyundai smashing into an innocent bystander's car across the street from a playground.[43]

74.     The Milwaukee police department released footage of the sixteen-year-old who killed himself and injured others following a highspeed chase in a stolen Kia on June 15, 2021, which ended after he careened into oncoming traffic at an excessive speed and crashed head-on into another vehicle

## E.   The lack of an immobilizer in the Class Vehicles has resulted in a swell of thefts that greatly outpace Kia and Hyundai's market share.

75.     Given the ease with which Class Vehicles can be stolen, the United States has experienced a swell in reported car thefts.

76.     For example, thefts of Kias and Hyundais in Chicago, Illinois went up more than 750% in July–August 2022 compared to the same time last year.[44]

77.     In Portland, Oregon the total number of vehicles stolen decreased by 5% in the 10 weeks preceding August 26, 2022, but in that period, the number of Hyundais being stolen increased by 153% and the number of Kias being stolen increased by 269%.[45]

---

[41] Jack Fitzgerald, *As Hyundai/Kia Thefts Grow, 2 Victims of the TikTok Trend Show Us What Happened to Their Cars*, CAR & DRIVER (Aug. 27, 2022), https://www.caranddriver.com/news/a40979551/hyundai-kia-car-thefts-tiktok-trend-milwaukee/.
[42] https://www.instagram.com/p/CTrjrdgL-Zc/?utm_medium=copy_link.
[43] https://www.instagram.com/p/CVNhjg9D64B/?utm_medium=copy_link.
[44] Tara Molina, *Thefts of Kias and Hyundais are skyrocketing, up 767% this summer in Cook County*, CBS CHICAGO (Aug. 11, 2022), https://www.cbsnews.com/chicago/news/thefts-of-kias-and-hyundais-are-skyrocketing-up-767-this-summer-in-cook-county/.

---

17
**COMPLAINT AND JURY TRIAL DEMAND**

78.     In Milwaukee, Wisconsin thefts of Kias and Hyundais increased 2,500% in January–June 2021 (2,890) compared to the same period the year before (111).[46] During this time, the city averaged about 16 Kia and Hyundai thefts a day.[47]

79.     These thefts greatly outpace the number of thefts one would expect based on their market share. From 2010–2020, Kia's market share stayed between 3–4%.[48] During the same period, Hyundai's market share was between 3–5%.[49]

80.     For instance, in Milwaukee, Hyundai and Kia thefts accounted for 20% of total car thefts in 2020, 67% of total car thefts in 2021, and 59% of total car thefts so far in 2022.[50]

81.     In St. Petersburg, Florida, 41% of stolen vehicles were made by Kia or Hyundai.[51]

82.     In Los Angeles, California, Kia and Hyundai vehicles account for 20% of all vehicle thefts in 2022.[52]

---

[45]     Portland Police (@PortlandPolice), TWITTER (Aug. 26, 2022, 11:18 AM), https://twitter.com/PortlandPolice/status/1563199199205662723.

[46]     *Thefts of Kia, Hyundai explode 2,500% in Milwaukee*, WISN 12 (June 17, 2021), https://www.wisn.com/article/thefts-of-kia-hyundai-explode-2500-in-milwaukee/36756668#.

[47]     *Thefts of Kia, Hyundai explode 2,500% in Milwaukee*, WISN 12 (June 17, 2021), https://www.wisn.com/article/thefts-of-kia-hyundai-explode-2500-in-milwaukee/36756668#.

[48]     *Kia U.S. Car Sales Data*, GOODCARBADCAR, https://www.goodcarbadcar.net/kia-us-sales-figures/ (last visited Sept. 14, 2022).

[49]     *Hyundai U.S. Car Sales Data*, GOODCARBADCAR, https://www.goodcarbadcar.net/hyundai-us-sales-figures/ (last visited Sept. 14, 2022).

[50]     Jack Fitzgerald, *As Hyundai/Kia Thefts Grow, 2 Victims of the TikTok Trend Show Us What Happened to Their Cars*, CAR & DRIVER (Aug. 27, 2022), https://www.caranddriver.com/news/a40979551/hyundai-kia-car-thefts-tiktok-trend-milwaukee/.

[51]     Mary O'Connell, *St. Pete Police warn about troubling car theft trend targeting Kia, Hyundai cars*, WFTS-TV/ABC ACTION NEWS (July 28, 2022), https://www.abcactionnews.com/news/region-pinellas/st-pete-police-warn-about-troubling-car-theft-trend-targeting-kia-hyundai-cars.

83.     In Denver, Colorado, Hyundais and Kias were fifth and sixth, respectively, on its list of most stolen cars.[53]

84.     In Columbus, Ohio, Kias and Hyundais have accounted for 38% of vehicle thefts in 2022.[54]

85.     Law enforcement from around the country have attributed the uptick in Kia and Hyundai thefts to the lack of an immobilizer and the ease with which they can be stolen.

86.     A property crimes detective with the police department in St. Petersburg, Florida explained to one news outlet, "What the thieves are doing is they're defeating the steering column, and they're able to override the ignition mechanism, allowing them to steal the vehicle much more easily and without a key or a key fob…."[55]

87.     The Los Angeles Police Department said that the "primary cause for the increase in vehicle thefts is that Kia and Hyundai vehicles, produced between 2010 thru 2021, are not equipped with an ignition immobilizer. Therefore, these vehicle ignitions can be compromised using a USB cable."[56]

---

[52] Los Angeles Police Department (@LAPDHQ), TWITTER (Aug. 25, 2022, 7:00 PM), https://twitter.com/LAPDHQ/status/1562953014838640640?s=20&t=KUPj9qzvsQnPonlCa4fbDw.
[53] *'Oh No, This Can't Happen Again': Man Has 2 Kias Stolen In 1 Month*, CBS COLORADO (Dec. 10, 2020, 11:59 PM), https://denver.cbslocal.com/2020/12/10/car-theft-kia-stolen-denver/.
[54] Gary Gastelu, *Kias and Hyundais continue to be stolen at alarming rates, police warn*, FOX NEWS (Aug. 2, 2022), https://www.foxnews.com/auto/kias-hyundais-stolen-police-warn.
[55] Mary O'Connell, *St. Pete Police warn about troubling car theft trend targeting Kia, Hyundai cars*, WFTS-TV/ABC ACTION NEWS (July 28, 2022), https://www.abcactionnews.com/news/region-pinellas/st-pete-police-warn-about-troubling-car-theft-trend-targeting-kia-hyundai-cars.
[56] Los Angeles Police Department (@LAPDHQ), TWITTER (Aug. 25, 2022, 7:00 PM), https://twitter.com/LAPDHQ/status/1562953014838640640?s=20&t=KUPj9qzvsQnPonlCa4fbDw.

**COMPLAINT AND JURY TRIAL DEMAND**

88.     Denver's local news was also reporting about this problem in December 2020, citing Denver's Police Commander to explain that Kias "are one of the top 10 stolen brands in Denver because they are easy to steal and easy to start."[57]

**F.   The skyrocketing thefts caused by the defects in the Class Vehicles have increased costs for the Class.**

89.     The cost to repair stolen Vehicles can be substantial. The cost to repair a window and steering column on a Class Vehicle alone can exceed $3,000.[58] Because cars taken on joy rides often experience further damage, the owner's total cost to repair their vehicle often exceed $10,000.[59] As noted below, Plaintiff Scott received an initial quote of $3,200 for damage to his Defective Hyundai after it was stolen the first time, but has since received multiple supplemental estimates due to other damage. After repairing the damage, Plaintiff Scott's Defective Hyundai was stolen a second time and has not yet been located.

90.     Moreover, due to the alarming rate in which Class Vehicles are being stolen, Defendants' authorized dealers and repair shops are experiencing shortages of the parts needed to repair them. Some parts are backordered up to eight weeks. As noted below, Plaintiff Sellers was unable to purchase parts to repair her car after it was stolen and damaged because the parts were out of stock.[60]

91.     The rate at which these Vehicles are being stolen is so high that certain auto insurance companies are either refusing to insure these Vehicles or have raised the rates. For example, as discussed below, Plaintiff Sellers was dropped by her insurance carrier after

[57] *Oh No, This Can't Happen Again': Man Has 2 Kias Stolen In 1 Month*, CBS COLORADO (Dec. 10, 2020, 11:59 PM), https://denver.cbslocal.com/2020/12/10/car-theft-kia-stolen-denver/.
[58] James E. Causey, *Motor vehicle thefts in Milwaukee are up 152%. Auto repair businesses say the worst may be yet to come*, MILWAUKEE JOURNAL SENTINEL (Feb. 2, 2021), https://www.jsonline.com/story/news/solutions/2021/02/03/motor-vehicle-thefts-up-152-milwaukee-so-far-2021/4266701001/.
[59] Id.

**COMPLAINT AND JURY TRIAL DEMAND**

the theft of her Defective Hyundai. Upon finding a new insurance company, her rates increased by $247.26 for the exact same coverage on her three vehicles. Plaintiff Francis also experienced an increase in her insurance rate after the theft of her Defective Kia. Prior to the theft, her insurance rate for a six-month period was $841, after the theft it rose to $977.

92.     Other harms caused by the auto thefts include other property that is stolen or damaged in the process, and the diminution in value of the Class Vehicles being targeted.

93.     Recognizing the gravity of the problem, Defendants have announced that all new model vehicles will be equipped with an immobilizer.[61] But this change offers little consolation to the thousands of consumers whose defective Vehicles were either stolen or continue to remain vulnerable to theft.

**G.  Defendants have long known about the security benefits immobilizers offer.**

94.     Even though the Defendants sell their vehicles in other countries with an immobilizer, Kia and Hyundai have largely refused to implement immobilizers as standard technology in virtually all of their vehicle lines in the United States except for their very high-end vehicles.

95.     For instance, in three petitions to NHTSA in 2007, Kia and Hyundai through HATCI sought exemptions from the PMR for the following three vehicle lines: (i) the Hyundai Azera, starting with the 2008 model year; (ii) the Hyundai Genesis, starting with the 2009 model year; and (iii) the Kia Amanti, starting with the 2009 model year.[62] Each

---

[60] Id.

[61] Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, Urban Milwaukee (July 24, 2021), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/.

[62] *See* 72 Fed. Reg. 39,661 (July 19, 2007) ("Azera Petition"); 73 Fed. Reg. 4,304 (Jan. 24, 2008) ("Genesis Petition"); and 75 Fed. Reg. 1,447 (Jan. 11, 2010) ("Amanti Petition").

Petition "provided a description and diagram of the identity, design, and location of the components of the antitheft device" installed on the vehicles that included, amongst other features: "a passive immobilizer consisting of an EMS (engine control unit), SMARTRA (immobilizer unit), an antenna coil and a transponder."[63]

96.     Defendants successfully obtained an exemption for each vehicle line by providing conclusive data on the effectiveness of similar immobilizer technology used by other manufacturers. Defendants explained that "the GM Pass-Key and Ford SecuriLock devices contain components that are functionally and operationally similar to [their antitheft] device."[64] Further, Defendants stated "the theft data from the National Crime Information Center (NCIC) show *a clear reduction in vehicle thefts* after the introduction of the GM and Ford devices."[65]

97.     Likewise, in its Petition for its Hyundai VI/Equus vehicle line dated September 11, 2009, HATCI referenced and provided an April 2006 report by JP Research, Inc., which concluded that antitheft devices were consistently much more effective in reducing thefts compared to parts marking. Specifically, the "report showed that of the 24 vehicles lines studied, those with antitheft devices were 70% more effective than parts marking in deterring theft."[66]

98.     But as with Defendants' previous Petitions, the Equus was billed as a luxury model. Thus, despite their knowledge of both the utility and ubiquity of this technology for more than fifteen years, Defendants avoided incorporating this safety measure as a standard feature into its less expensive—albeit, more widely disseminated—models.

---

[63] *See* Azera Petition at 39,661; Genesis Petition at 4,304; and Amanti Petition at 1,448.
[64] *See* Azera Petition at 39,662; Genesis Petition at 4,305; Amanti Petition at 1,448.
[65] *Id.* (emphasis added)
[66] *See* 75 Fed. Reg. 6,253 (Feb. 8. 2010).

**COMPLAINT AND JURY TRIAL DEMAND**

99.     The ease with which the Class Vehicles may be stolen is not surprising to Defendants. Upon information and belief, Defendants have known of the unusually high rate of thefts experienced by Class Vehicles for many years, through scores of customer complaints relayed through their dealers.

100.    Moreover, Defendants must have known how these Vehicles were being stolen because they sell replacement parts to dealerships and autobody shops around the country needed to repair the stolen Vehicles. Because the Vehicles are being stolen in the same way, Defendants would have experienced a spike in orders for the same replacement parts.

101.    But Defendants continued to sell the Class Vehicles, flooding the market with more unsafe cars susceptible to theft. Only when the problem became too large to ignore did Defendants decide to introduce immobilizer technology to all future new vehicles going forward.

102.    Kia and Hyundai likely refused to implement this technology as a standard feature in the Class Vehicles as a cost-saving measure to improve their profitability.

## V.     PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

103.    **Amanda Sue Sellers**: Plaintiff Sellers is an Illinois citizen who lives and resides in Peoria, Illinois.  Plaintiff Sellers purchased a Hyundai Veloster Base Model in 2018 ("the Defective Hyundai").

104.    Plaintiff Sellers bought this vehicle because she thought it would be theft resistant. In fact, the Defective Hyundai was advertised as an anti-theft vehicle; it had an anti-theft sticker on it when she bought it.

105.    In addition to the anti-theft sticker, Plaintiff Sellers was required to sign a document agreeing to have a GPS tracker installed in the Defective Hyundai as a term of her financing as an additional anti-theft measure.

106.   On July 16, 2022—one day after Plaintiff Sellers had completed a refinance of the vehicle—the Defective Hyundai was stolen out of her driveway in Peoria, Illinois.

107.   On July 20, 2022, her vehicle was recovered along with two Kia vehicles.

108.   When she arrived at the scene, she observed evidence of the crime and extensive damage to the vehicle.  Evidence included the tell-tale signs of damage to the same parts of the Hyundai shown to be susceptible in the TikTok trend and a destroyed USB cord.

109.   Specifically, her husband's USB cord had been unplugged, broken, and thrown to the floor of the Defective Hyundai. Her license plates were also stolen.

110.   The aftermath of the theft resulted in Plaintiff Sellers incurring numerous costs including:

> a.   Paying to have the Defective Hyundai towed home from the recovery site.

> b.   Paying for new license plates.

> c.   Shortly after she made an insurance claim, her insurance provider dropped her.

> d.   As a result of being dropped by her insurer, she had to find new insurance.  Her new insurance through Progressive was significantly more expensive than the prior insurance. Specifically, under her prior insurance she paid $250.88 per month to insure her three vehicles, and she now pays $498.14 per month to insurer her three vehicles. This increase is not related to increased types of coverage, as both her prior and current policies had the same type of coverage.

111.   Plaintiff Sellers' Defective Hyundai was completely out-of-commission for approximately two weeks.

112.   Her insurance company has not yet paid anything to fix the Defective Hyundai.

113.   While Plaintiff Sellers has been waiting for the repair shop to get her an estimate of costs, she investigated getting the parts to try to fix it herself. However, because of the prevalence of the TikTok trend targeting Defective Hyundais, the necessary parts are out of stock.

114.   If Plaintiff Sellers had known about the defects in the vehicle, she would not have purchased it or would have only purchased it for significantly less money.

115.   **Nadine Quate Francis**: Plaintiff Francis is a Virginia citizen who lives and resides in Henrico, Virginia. Plaintiff Francis purchased a Kia Forte in August 2019 ("the Defective Kia").

116.   Plaintiff Francis bought the Defective Kia for herself because she wanted and needed a reliable vehicle.

117.   When she bought the Defective Kia, she did not know about its security flaws; the "Kia challenge" was not trending until almost a year-and-a-half after her purchase.

118.   Since the Kia Challenge TikTok trend became popular in May 2022, her car insurance rates have skyrocketed. For her six-month policy period that renewed in February 2022—a few months before the Kia challenge was trending—she paid $841 for her policy premium. Yet, when her policy was up for renewal in August 2022, the sixth-month premium had jumped to $977.

119.   If Plaintiff Francis had known about the defects in the vehicle, she would not have purchased it or would have only purchased it for significantly less money.

120.   **Thomas Benton Harang, Jr.**: Plaintiff Harang is a Louisiana citizen who lives and resides in New Orleans, Louisiana. Plaintiff Harang purchased a Hyundai Elantra in March 2019 ("the Defective Hyundai").

121.   The Defective Hyundai cost approximately $10,000. Plaintiff Harang paid a down payment of approximately $4,000 for the Defective Hyundai.

122.    Approximately 2 months ago, Mr. Harang became aware of the security problems with Defective Hyundais and Kias. As a result, Mr. Harang purchased a steering column lock as a theft prevention device to protect his Defective Hyundai.

123.    If Mr. Harang had known about the defects in the vehicle, he would not have purchased it or would have only purchased it for significantly less money.

124.    **Ian Michael Scott**: Plaintiff Scott is a Louisiana citizen who lives and resides in New Orleans, Louisiana. Plaintiff Scott purchased a Hyundai Sonata on December 23, 2020 ("the Defective Hyundai").

125.    Plaintiff Scott paid $20,420.50 to purchase the Defective Hyundai—including $9,000 in a down payment.

126.    To pay the rest of the purchase price for the Defective Hyundai, he secured financing through Hyundai Motor Finance.

127.    On July 25, 2022, a vehicle pulled up near Plaintiff Scott's home. An individual got out, broke a window on the Defective Hyundai, and within approximately 15 seconds, stole and drove away in the Defective Hyundai.

128.    The Defective Hyundai was recovered by the New Orleans Police Department on July 27, 2022, and towed to a lot, a charge that Plaintiff Scott, by and through his insurer, was responsible for paying.

129.    On approximately September 2, 2022, Plaintiff Scott had the vehicle towed again, this time to a mechanic shop.

130.    The damage to the Defective Hyundai was extensive. It included broken window glass, body damage to the right side, a broken transmission that needs to be replaced, damage to the undercarriage of the car, and an ignition that was ripped out and destroyed.

131.   Only some of this damage was initially apparent (*e.g.*, broken glass) and the original estimate was for $3,200. However, there have been multiple supplemental estimates and claims between the body shop and Plaintiff Scott's insurer.

132.   Plaintiff Scott's six-month premium with his insurer for the period starting July 5, 2022 is $955.22. Under his policy, Plaintiff Scott had to pay a $1,500 deductible for all these car repairs.

133.   Additionally, the insurer only covered approximately $900 in rental car coverage while his vehicle was being repaired. On approximately August 23, 2022, Plaintiff Scott started paying out-of-pocket for his rental car vehicle, a cost totaling approximately $380/week.

134.   Plaintiff Scott's insurance renewed just before the theft, but his claim will likely lead to increased premiums when his policy renews in February 2023.

135.   In addition, Plaintiff Scott also had all the contents stolen from his car, including a computer (approximately $400), clothing, and other miscellaneous items.

136.   After Plaintiff Scott's Defective Hyundai was recovered, evidence included the tell-tale signs of damage to the same parts of the Hyundai susceptible to the TikTok trend—including ignition damage and a USB cord that did not belong to Plaintiff Scott in the Defective Hyundai.

137.   On October 31, 2022, Plaintiff Scott's Defective Hyundai was stolen a second time and has not been located as of the filing of this complaint.

138.   If Plaintiff Scott had known about the defects in the vehicle, he would not have purchased it or would have only purchased it for significantly less money.

## VI.   <u>CHOICE OF LAW ALLEGATIONS</u>

139.   Because this Complaint is brought in California, California's choice of law regime governs the state law allegations in this Complaint. Under California's choice of law

rules, California law applies to the claims of all Class members, regardless of their state of residence or state of purchase.

140.     Because two of the Defendants are headquartered—and made decisions relevant to these claims—in California, California has a more substantial connection to, and materially greater interest in, the rights, interests, and policies involved in this action than any other state. Application of California law to Defendants and the claims of all Class members would not be arbitrary or unfair.

141.     Plaintiffs plead claims on behalf of a nationwide class because the laws for each state do not vary materially for these claims. Alternatively, Plaintiffs plead state law classes claims as indicated below. This Complaint refers to the nationwide and state classes collectively as the "Class," unless noted otherwise.

## VII.   CLASS ACTION ALLEGATIONS

142.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under Fed. R. Civ. P. 23.

143.     Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, the classes that Plaintiffs seek to represent shall be defined as follows:

All persons and entities nationwide that purchased or leased a Class Vehicle (the "Nationwide Class").

All persons and entities that purchased or leased a Class Vehicle in the State of Illinois (the "Illinois Class").

All persons and entities that purchased or leased a Class Vehicle in the State of Virginia (the "Virginia Class").

All persons and entities that purchased or leased a Class Vehicle in the State of Louisiana (the "Louisiana Class").

(Collectively, the "Class" unless otherwise noted.)

144.   Excluded from the Class are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

145.   Plaintiffs seek only damages and injunctive relief on behalf of themselves and the Class members. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiffs and/or the Class members.

146.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants and governmental officials. Upon information and belief, Defendants have sold and leased many thousands of Vehicles nationwide during the relevant time period. Therefore, the Class members are so numerous that individual joinder of all Class members is impracticable under Fed. R. Civ. P. 23(a)(1).

147.   Common questions of law and fact exist as to all Class members. These common legal and factual questions include:

      a.   Whether Defendants designed, advertised, sold, and placed the Class Vehicles into the stream of commerce;

      b.   Whether the Class Vehicles were sold with the defects described above;

      c.   Whether the defects in the Class Vehicles are safety and/or security defects that created a foreseeable risk of harm to Plaintiffs and the Class;

      d.   Whether Defendants breached implied warranties made to the Class members;

      e.   Whether Defendants knew about the defects and, if so, how long Defendants have known about the defects;

      f.   Whether Defendants concealed the defects;

g.      Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws asserted herein;

h.      Whether the Class members have suffered damages as a result of the conduct alleged herein, and if so, the measure of such damages, including diminution of value and deprivation of the benefit of the bargain; and

i.      Whether the Class members are entitled to injunctive relief.

148.    Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3) because Plaintiffs and each Class member have a Vehicle with the same defects.

149.    Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class members. Further, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automotive class action litigation, and Plaintiffs intend to prosecute this action vigorously. Therefore, the interests of the Class members will be fairly and adequately protected.

150.    A class action is appropriate under Fed. R. Civ. P. 23(b)(3) because class action is superior to any other available means for fairly and efficiently adjudicating the controversy. In this regard, the Class members' interests in individually controlling the prosecution of separate actions are low given the magnitude, burden, and expense of individual prosecutions against large corporations such as Defendants. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits. Individualized litigation presents a potential for inconsistent or contradictory results and also increases the delay and expense to all parties and the court system presented by the legal and factual issues of this case. By contrast, the class action procedure here will have no management difficulties. Defendants' records and the records available publicly will

easily identify the Class members. The defects are common to all Vehicles; therefore, the same common documents and testimony will be used to prove Plaintiffs' claims as well as the claims of the Class members. Finally, proceeding as a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court

151.   A class action is appropriate under Fed. R. Civ. P. 23(b)(2) because, as stated above, Defendants have acted or refused to act on grounds that apply generally to the Class members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all Class members.

## VIII.  Causes of Action

### A.  Causes of Action Brought on Behalf of the Nationwide Class

#### 1.  Count 1—Breach of Implied Warranty (Based on California Law)

152.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

153.   This count is brought under California law on behalf of a Nationwide Class.

154.   As detailed herein, Defendants designed, manufactured, distributed, and sold the Class Vehicles knowing that consumers like Plaintiffs and the Class would purchase these products from Kia and Hyundai's authorized dealers as a means of transportation.

155.   As merchants of the Class Vehicles, Kia and Hyundai warranted to the Plaintiffs and the Class that the Class Vehicles were fit for the ordinary purpose for which they are used.

156.   Plaintiffs relied on this warranty to their detriment.

157.   The Class Vehicles are not "merchantable" because they are not reasonably fit for the ordinary purpose for which they are sold, which is to provide safe, reliable transportation. To the contrary, the Class Vehicles pose a substantial safety hazard because the defects render them vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

158.    Sufficient privity of contract exists to assert this implied warranty claim.

159.    Defendants market and advertise the sale of the Class Vehicles in various media outlets across the United States, to prospective consumers including the Plaintiffs and the Class.

160.    Defendants advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the nation. Through Defendants' websites, consumers obtain information about vehicles; design specific vehicles to meet their needs; obtain information about the value of trade-in vehicles; request additional marketing materials; and request quotes for vehicles. Defendants then send these consumers to "authorized dealers" to consummate sales and leases.

161.    Defendants control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

162.    Plaintiffs purchased and/or leased their respective Vehicles from "authorized dealers" with the understanding that these dealers were acting on behalf of Defendants.

163.    The sole and express purpose that each authorized Kia and Hyundai dealer has when it acquires the vehicles from Kia and Hyundai is to immediately re–sell them to the end–users like Plaintiffs and the Class members.

164.    Defendants' conduct, and the conduct of their respective dealers, thus create a justifiable belief on the part of Plaintiffs and Class members that the dealers are agents of Kia and/or Hyundai, which the Plaintiffs relied on to their detriment.

165.   Thus, each Kia and Hyundai dealership operates as the actual and/or apparent agent of Defendants named herein, which satisfies any privity requirement.

166.   Moreover, the purchase and/or lease agreements between the Plaintiffs and their respective dealers were entered directly and primarily for Kia and Hyundai's benefit.

167.   Likewise, any contract whereby Defendants' authorized dealers acquire the Class Vehicles from Defendants to resell to the end-user is also for the express benefit of Plaintiffs and the Class. On information and belief, Defendants' authorized dealers make little money on the actual sale or lease of new vehicles, including the Class Vehicles.

168.   Plaintiffs and the members of the Class therefore have standing to assert implied warranty claims against Defendants by virtue of their status as intended, third-party beneficiaries of these dealership sales agreements, which further satisfies the privity requirement.

169.   Privity thus exists between Defendants and the Plaintiffs and the Class by virtue of the express warranties provided through their purchase and/or lease agreements.

170.   Moreover, the Magnuson–Moss Warranty Act ("MMWA") provides that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, but it cannot disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a) ("No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product. . . ."). A manufacturer should not be permitted to avoid this prohibition by claiming an ostensible lack of privity when the manufacturer itself chose its distribution model.

171.   Imposing a rigid privity requirement in this case would permit Defendants to escape both the letter and spirit of the MMWA through their preferred distribution scheme; one in which the only parties in strict privity that can assert an implied warranty claim are Defendants' own dealers who would never need to assert the claim in the first instance.

172.   Consequently, any rigid application of a state law privity requirement would violate the Supremacy Clause and be preempted. *See* U.S. Const. art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

173.   As a direct and proximate result of Defendants' breach of these implied warranties, Plaintiffs and the Class have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial. These damages include, but are not limited to, overpayment for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of Vehicles, the loss of use of the Vehicles, costs associated with the replacement of the totaled Class Vehicles, the diminution in value of the stolen Class Vehicles that were not totaled, and/or increased insurance premiums.

174.   The circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose, such that the Plaintiffs and the Class may seek alternative remedies. Indeed, these warranties have denied the Plaintiffs and the Class the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever-present risk of them being stolen.

175.   Further, Kia and Hyundai's exclusion and/or limitation of consequential damages in their New Vehicle Limited Warranties is unconscionable and void for the reasons stated above.

176.   Accordingly, the Plaintiffs and the Class are entitled to damages flowing from Defendants' breach of their implied warranties, as well as all consequential and incidental damages resulting from this breach.

177.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result

of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

### 2. Count 2—Violations of Magnuson Moss Warranty Act (15 U.S.C. § 2301, *et seq.*)

178. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

179. Plaintiffs bring this claim on behalf of the Nationwide Class.

180. Congress enacted the MMWA, 15 U.S.C. § 2301, *et seq.*, to address the widespread misuse of merchants' express warranties and to protect consumers from deceptive warranty practices. The MMWA imposes civil liability on any "warrantor" who fails to comply with any obligation under a written or corresponding implied warranty. *Id.* § 2310(d)(1).

181. The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

182. Plaintiffs and members of the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

183. Kia and Hyundai are "suppliers" and "warrantors" as those terms are defined in 15 U.S.C. § 2301(4) & (5), respectively

184. In connection with the sale and/or lease of the Class Vehicles, Defendants supplied Plaintiffs and the Class with "written warranties" as that term is defined in 15 U.S.C. § 2301(6).

185. 15 U.S.C. § 2310(d)(1) provides that "a consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under [the MMWA], or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state."

186.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

187.   Defendants provided Plaintiffs and Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the MMWA, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

188.   Defendants breached their implied warranties, as described herein, and are therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). The defects rendered the Class Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

189.   Plaintiffs used their respective Class Vehicles in a manner consistent with their intended use and performed every duty required of them under the terms of the warranty, except as may have been excused or prevented by Defendants' conduct or by operation of law.

190.   Plaintiffs and the Class seek to recover damages resulting directly from Defendants' breach of their implied warranties and their deceitful and unlawful conduct described herein. These damages include, but are not limited to, overpayment for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their Vehicles, the loss of use of their respective Vehicles, costs associated with the replacement of the totaled Class Vehicles, diminution in value of a stolen Class Vehicles that were not totaled, and/or increased insurance premiums.

191.   The MMWA also permits "other legal and equitable" relief. 15 U.S.C. § 2310(d)(1). Plaintiffs seek reformation of Defendants' respective written warranties to

comport with their obligations under the MMWA and with consumers' reasonable expectations. Plaintiffs also seek to enjoin Defendants from acting unlawfully as alleged herein.

192.   Finally, Plaintiffs intend to seek such an award as prevailing consumers at the conclusion of this case. The MMWA provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in the Court's discretion. 15 U.S.C. § 2310(d)(2).

### 3.   Count 3—Unjust Enrichment

193.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

194.   This claim is pleaded in the alternative to any contract-based claims asserted by the Plaintiffs noted above. *See* Fed. R. Civ. P. 8(d)(2). Moreover, a claim for unjust enrichment is properly brought where, as here, Defendants contend that their warranties do not cover damages stemming from the defects.

195.   Plaintiffs bought and/or leased their Class Vehicles new, directly from a Kia or Hyundai dealership.

196.   Every year, Defendants make millions of dollars in revenue selling and leasing new Class Vehicles through their respective dealer networks across the United States.

197.   Plaintiffs allege upon information and belief that consumers are not permitted to buy Class Vehicles directly from Defendants, but that the proceeds flow through various dealers and/or related companies (e.g., their finance companies) back to Defendants.

198.   Accordingly, the purchase and lease of new Class Vehicles confers a direct monetary benefit on Defendants.

199.   Used Class Vehicle purchasers also conferred a benefit on Defendants. Defendants profit off the replacement parts needed to service and repair these Vehicles.

200.   Further, as more used Class Vehicles stay in the stream of commerce, Defendants' brand awareness rises, which is of substantial value to vehicle manufacturers.

Defendants have touted their vehicles as not only reliable and durable, but also as having lower depreciation rates and ownership costs over their useful lives.[67]

201.   Defendants tout these benefits to promote the sale and lease of their new cars for pecuniary benefit.

202.   Accordingly, Plaintiffs and the Class conferred a benefit upon Defendants, whether directly, indirectly, or through one or more affiliate entities.

203.   Defendants knew and appreciated the benefits conferred upon them through the sale of the Class Vehicles to Plaintiffs and members of the Class. Many of the Class Vehicles were financed through Kia Motor Finance or Hyundai Motor Finance.

204.   Notably, federal law mandates that Kia and Hyundai maintain records of first-time purchasers of Class Vehicles, *see* 49 U.S.C. § 30117(b), and remain able to identify the owners of their used cars, including the owners of certain Class Vehicles, to comply with recall notification procedures under applicable law. *See id.* § 30119(d)(1)(A).

205.   Defendants have long represented to the consuming public that the Class Vehicles are safe, reliable, and durable even though they knew of the defects. Not only did Defendants fail to equip the Class Vehicles with an industry standard anti-theft device, they failed to comply with FMVSS 114.

206.   As a result of Defendants' wrongful conduct, unsuspecting consumers like Plaintiffs and the Class overpaid for the Class Vehicles and incurred additional costs, thereby allowing Defendants to earn more profit.

---

[67]   *Kia        Sweeps        IntelliChoice        CPO        Awards*, https://www.kiamedia.com/us/en/media/pressreleases/15857/kia-sweeps-        intellichoice-cpo-awards (last visited Aug. 19, 2022)

207.    Defendants continued to market the Class Vehicles despite knowing that they were unsafe and susceptible to theft, foisting the cost they would otherwise have been forced to bear through a voluntary recall or otherwise on Plaintiffs and the Class.

208.    Under these circumstances, it would be unjust to allow Defendants to accept and retain the benefits identified herein without paying Plaintiffs and the Class for their value.

### 4.    Count 4—Violations of the California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *Et Seq.*)

209.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

210.    Plaintiffs bring this claim as part of the Nationwide Class.

211.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

212.    The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

213.    Plaintiffs and the other Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other Class members, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

214.    As alleged herein, Defendants made misleading representations and omissions concerning the benefits, performance, and safety of the Class Vehicles.

215.    In purchasing or leasing the Class Vehicles, Plaintiffs and other Class members were deceived by Defendants' failure to disclose their knowledge of the defects.

216.    Defendants' conduct as described herein was and is in violation of the CLRA. Defendants' conduct violates at least the following enumerated CLRA provisions:

a.      Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have.

b.      Cal Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade if they are of another.

c.      Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

d.      Cal Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

217.   Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and Class members.

218.   In purchasing or leasing the Class Vehicles, Plaintiffs and other Class members were deceived by Defendants' failure to disclose their knowledge of the defects.

219.   Plaintiffs and other Class members had no way of knowing Defendants' representations were false, misleading, and incomplete or knowing the true nature of the defects.

220.   As alleged herein, Defendants engaged in a pattern of deception and public silence in the face of known defects. Plaintiffs and other Class members did not, and could not, unravel Defendants' deception on their own.

221.   Defendants knew or should have known their conduct violated the CLRA.

222.   Defendants owed Plaintiffs and the Class members a duty to disclose the truth about the defects because the defects created a safety hazard and Defendants:

a.      Possessed exclusive knowledge of the defects,

b.      Intentionally concealed the foregoing from Plaintiffs and Class members; and/or

c.      Made incomplete representations in advertisements and on their websites, failing to warn the public of the defects.

223.   Defendants had a duty to disclose that the Class Vehicles were fundamentally flawed as described herein, because the defects created a safety hazard, and Plaintiffs and the other Class members relied on Defendants' material misrepresentations and omissions regarding the features of the Class Vehicles.

224.   Defendants' conduct proximately caused injuries to Plaintiffs and the other Class members that purchased the Class Vehicles and suffered harm as alleged herein.

225.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Class members incurred costs, including overpaying for their Class Vehicles that have suffered a diminution in value.

226.   Defendants' violations cause continuing injuries to Plaintiffs and other Class members.

227.   Defendants' unlawful acts and practices complained of herein affect the public interest.

228.   Defendants knew of the defects, and that the Class Vehicles were materially compromised by them.

229.   The facts concealed and omitted by Defendants from Plaintiffs and other Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Class Vehicle or pay a lower price.

230.   Plaintiffs' and the other Class members' injuries were proximately caused by Defendants' unlawful and deceptive business practices.

231.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs seek an order enjoining Defendants from engaging in the methods, acts, or practices alleged herein, including further concealment of the defects.

232.   Plaintiffs have provided Defendants with the appropriate notice and demand pursuant to Cal. Civ. Code §§ 1780(a) and (d).

233.   Pursuant to Cal. Civ. Code § 1782, if Defendant does not rectify its conduct within 30 days, Plaintiffs intend to amend this Complaint to add claims under the Cal. Civ. Code for:

a.   Actual damages;

b.   Restitution of money to Plaintiffs and Class members, and the general public;

c.   Punitive damages;

d.   An additional award of up to $5,000 to each Plaintiff and any Class member who is a "senior citizen";

e.   Attorneys' fees and costs; and

f.   Other relief that this Court deems proper.

**5.   Count 5—Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, _Et Seq._)**

234.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

235.   Plaintiffs bring this claim on behalf of the Nationwide Class.

236.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, _et seq._, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising."

237.   Defendants' conduct, as described herein, was and is in violation of the UCL. Defendants' conduct violates the UCL in at least the following ways:

a.   By failing to disclose the defects;

b.   By selling and leasing Class Vehicles that suffer from the defects;

c.   By knowingly and intentionally concealing the defects from Plaintiffs and the other Class members;

d.      By marketing Class Vehicles as safe, convenient, and defect free, with cutting edge technology, all while knowing of the defects; and

e.      By violating other California laws, including California consumer protection laws.

238.    Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the other Class members.

239.    In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by Defendants' failure to disclose the defects.

240.    Plaintiffs and the other Class members reasonably relied upon Defendants' misrepresentations and omissions. They had no way of knowing that Defendants' representations were false, misleading, and incomplete. As alleged herein, Defendants engaged in a pattern of deception and public silence in the face of known defects. Plaintiffs and the other Class members did not, and could not, unravel Defendants' deception on their own.

241.    Defendants knew or should have known that their conduct violated the UCL.

242.    Defendants owed Plaintiffs and the other Class members a duty to disclose the truth about the defects because the defects created a safety hazard and Defendants:

a.      Possessed exclusive knowledge of the defects;

b.      Intentionally concealed the foregoing from Plaintiffs and the other Class members; and/or

c.      Made incomplete representations by failing to warn the public or to publicly admit the defects.

243.    Defendants' conduct proximately caused injuries to Plaintiffs and the other Class members that purchased the Class Vehicles and suffered harm as alleged herein.

244.    Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Class members incurred costs, including overpaying for their Class Vehicles that have suffered a diminution in value.

245.    Defendants' violations cause continuing injuries to Plaintiffs and Class members.

246.    Defendants' unlawful acts and practices complained of herein affect the public interest.

247.    Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and the other Class members to purchase their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased these Class Vehicles, would not have purchased these Class Vehicles at the prices they paid, and/or would have purchased less expensive alternative vehicles that did not contain the defects and did not fail to live up to industry standards.

248.    Accordingly, Plaintiffs and the other Class members have suffered injury-in-fact, including lost money or property, as a result of Defendants' misrepresentations and omissions.

249.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and Class members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other relief as may be appropriate.

## 6.   Count 6—Fraud by Concealment (Based on California Law)

250.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

251.    Plaintiffs bring this claim on behalf of the Nationwide Class.

252. Defendants intentionally concealed the defects.

253. Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on their websites, that the Class Vehicles they were selling had no significant defects, were reliable, and would perform and operate properly.

254. Defendants knew about the defects when these representations were made.

255. The Class Vehicles purchased by Plaintiffs and the other Class members contained the defects.

256. Defendants had a duty to disclose the defects as alleged herein, because it created a safety hazard and Plaintiffs and the other Class members relied on Defendants' material representations.

257. As alleged herein, at all relevant times, Defendants have held out the Class Vehicles to be free from defects. Defendants touted many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defects. This made Defendants' other disclosures about the Class Vehicles deceptive.

258. The truth about the defects was known only to Defendants; Plaintiffs and the other Class members did not know of these facts and Defendants actively concealed these facts from Plaintiffs and Class members.

259. Plaintiffs and the other Class members reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiffs and Class members by concealing the true facts about the Class Vehicles.

260. Defendants' false representations and omissions were material to consumers because they concerned qualities of the Class Vehicles that played a significant role in their value.

261.   Defendants had a duty to disclose the defects and violations with respect to the Class Vehicles because details of the true facts were known and/or accessible only to Defendants, Defendants had exclusive knowledge as to such facts, and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class members.

262.   Defendants also had a duty to disclose because they made general affirmative representations about the technological and safety innovations included with their Vehicles, without telling consumers that the Class Vehicles had fundamental defects that would affect the safety, quality, and performance of the Class Vehicle.

263.   Defendants' disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased by Plaintiffs and Class members.

264.   Defendants have still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding the defects.

265.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty technology, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

266.   Because of Defendants' concealment and/or suppression of the true quality of the Class Vehicles' security systems, Plaintiffs and Class members sustained damage because they own or lease Class Vehicles that are diminished in value. Had Plaintiffs and Class members been aware of the defects in the Class Vehicles, Plaintiffs and Class members

would have paid less for their Class Vehicles or would not have purchased or leased them at all.

267.    The value of Plaintiffs' and Class members' Class Vehicles have diminished as a result of Defendants' fraudulent concealment of the defects, which would make any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

268.    Accordingly, Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

269.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and to enrich the Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

   **7.   <u>Count 7—Breach of Implied Warranty of Merchantability (Cal. Com. Code § 2314)</u>**

270.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

271.    Plaintiffs bring this claim on behalf of the Nationwide Class.

272.    Defendants are and were at all relevant times merchants with respect to motor vehicles under Cal. Com. Code § 2104.

273.    A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

274.    Defendants marketed the Class Vehicles as safe and reliable vehicles. Such representations formed the basis of the bargain in Plaintiffs' and Class members' decisions to purchase or lease the Vehicles.

275.   Plaintiffs and other Class members purchased or leased the Class Vehicles from Defendants, through Defendants' authorized agents for retail sales, through private sellers, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles.

276.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

277.   Because of the defects, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

278.   Defendants knew about the defects, allowing Defendants to cure their breach of warranty if they chose.

279.   Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defects. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class members. Among other things, Plaintiffs and other Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Class members, and Defendants knew of the defects at the time of sale.

280.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

281.   Accordingly, Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

**B.   Claims Brought on Behalf of the Illinois Class**

1.   **Count 8—Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, et seq., and 720 ILCS 295/1A)**

282.   Plaintiff Sellers incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

283.   Plaintiff Sellers brings this claim on behalf of herself and the Illinois Class.

284.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 ILCS 505/2.

285.   Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

286.   Plaintiff Sellers and the Illinois Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

287.   Defendants violated the Illinois CFA by concealing and failing to disclose the defects. Defendants had an ongoing duty to Plaintiff Sellers and the Illinois Class to refrain from unfair and deceptive practices under the Illinois CFA in the course of their business.

288.   Plaintiff Sellers and the Illinois Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

289.     Pursuant to 815 ILCS 505/10a(a), Plaintiff Sellers and the Illinois Class seek monetary relief against Defendants in the amount of actual damages as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

290.     Plaintiff Sellers and the Illinois Class also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS 505/1, *et seq.*

### 2. Count 9—Breach of the Implied Warranty of Merchantability (810 ILCS §§ 5/2-314 and 5/2A-212)

291.     Plaintiff Sellers incorporates by reference all preceding allegations as though fully set forth herein.

292.     Plaintiff Sellers brings this claim on behalf of herself and the Illinois Class.

293.     Defendants were at all relevant times "merchants" with respect to motor vehicles under 810 ILCS §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

294.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 ILCS §§ 5/2-105(1) and 5/2A-103(1)(h).

295.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 ILCS §§ 28-2-314 and 28-12-212.

296.     These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are defective in that the defects rendered them unsafe, inconvenient, and imperfect such that Plaintiff Sellers and the other Illinois Class members would not have purchased the Vehicles had they known of the defects.

297.     Defendants knew about the defects at the time of purchase, allowing them to cure their breach of warranty if they chose.

298.    Defendants were provided notice of these issues by numerous complaints against them, including the instant Complaint; customer complaints, letters, and emails; communications from dealers and other repair facilities; and other communications from Class members.

299.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff Sellers and the other Illinois Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

**C.   Claims Brought on Behalf of the Virginia Class**

    **1.   Count 9—Violation of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, *et seq.*)**

300.    Plaintiff Francis incorporates by reference all preceding allegations as though fully set forth herein.

301.    Plaintiff Francis brings this claim on behalf of herself and the Virginia Class.

302.    Defendants are "suppliers" under Va. Code Ann. § 59.1-198.

303.    The sale of the Class Vehicles with the defects to the Class members was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

304.    The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that goods or services have certain characteristics"; "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model"; "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised"; "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

305.   Defendants violated the Virginia CPA by misrepresenting that the Class Vehicles had certain quantities, characteristics, uses, or benefits; misrepresenting that they were of a particular standard, quality, grade, style, or model; advertising them with intent not to sell or lease as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

306.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

307.   In purchasing or leasing the Class Vehicles, Plaintiff Francis and the Virginia Class members were deceived by Defendants' failure to disclose their knowledge of the defects.

308.   Plaintiff Francis and the Virginia Class members had no way of knowing Defendants' representations were false, misleading, and incomplete or knowing the true nature of the defects.

309.   Defendants knew or should have known their conduct violated the Virginia CPA.

310.   By failing to disclose and by actively concealing the defects in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Virginia CPA. Defendants deliberately withheld the information about the defects, in order to ensure that consumers would purchase the Class Vehicles.

311. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the serious defects discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

312. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff Francis and the Virginia Class members, about the true safety and reliability of Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

313. Defendants knew or should have known that their conduct violated the Virginia CPA.

314. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the defects or their failure to reasonably investigate them.

315. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or defects, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving vehicles highly prone to theft.

316. Defendants owed Plaintiff Francis and the Virginia Class members a duty to disclose the true safety and reliability of the Class Vehicles installed in them because Defendants:

a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.     Intentionally concealed the foregoing from Plaintiff Francis and the Virginia Class members; and/or

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff Francis and the Virginia Class members that contradicted these representations.

317.    Because Defendants fraudulently concealed the defects in the Class Vehicles, a raft of negative publicity resulted once the defects were disclosed, and the value of the Class Vehicles has greatly diminished.

318.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the defects in Class Vehicles were material to Plaintiff Francis and the Virginia Class.

319.    Plaintiff Francis and the Virginia Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the defects in the Class Vehicles, Plaintiff Francis and the Virginia Class members would have paid less for their vehicles or would not have purchased or leased them. Plaintiff Francis and the Virginia Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

320.    Defendants' violations present a continuing risk to Plaintiff Francis and the Virginia Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

321.    As a direct and proximate result of Defendants' violations of the Virginia CPA, Plaintiff Francis and the Virginia Class have suffered injury-in-fact and/or actual damage.

322.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiff Francis and the Virginia Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for Plaintiff Francis and each Virginia Class member. Because Defendants' conduct was committed willfully and knowingly, Plaintiff Francis is entitled to recover for herself and each Virginia Class member the greater of (a) three times actual damages or (b) $1,000.

323.   Plaintiff Francis and the Virginia Class also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq.*

### 2.   Count 10—Breach of the Implied Warranty of Merchantability (Va. Code Ann. § 8.2-314)

324.   Plaintiff Francis incorporates by reference all preceding allegations as though fully set forth herein.

325.   Plaintiff Francis brings this claim on behalf of herself and the Virginia Class.

326.   Defendants are and were at all relevant times merchants with respect to motor vehicles within the meaning of Va. Code Ann. § 8.2-314.

327.   A warranty that the Class Vehicles were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Va. Code Ann. § 8.2-314.

328.   The Class Vehicles are not "merchantable" because they are not reasonably fit for the ordinary purpose for which they are sold, which is to provide safe, reliable transportation. To the contrary, the Class Vehicles pose a substantial safety hazard because the defects render them vulnerable to theft, making them prime targets to be used as instrumentalities of criminal activity, including reckless driving.

329.   Defendants were provided notice of these issues by their own knowledge, customer complaints, numerous complaints filed against them and/or others, internal

investigations, numerous individual letters, and communications sent by consumers before or within a reasonable amount of time after the allegations of the defects became public.

330.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff Francis and the Virginia Class members have been damaged in an amount to be proven at trial.

**D.   Claims Brought on Behalf of the Louisiana Class**

**1.   Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. § 51:1401, *et seq.*)**

331.   Plaintiffs Harang and Scott incorporate by reference all preceding allegations as though fully set forth herein.

332.   Plaintiffs Harang and Scott bring this claim on behalf of themselves and the Louisiana Class.

333.   Plaintiffs Harang and Scott, the Louisiana Class, and Defendants are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

334.   Plaintiffs Harang and Scott and the Louisiana Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

335.   Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

336.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL by failing to disclose and actively concealing the true safety and reliability of the Class Vehicles due to the defects.

337.   In the course of their business, Defendants failed to disclose and actively concealed true safety and reliability of the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in

unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

338. By failing to disclose and by actively concealing the defects in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Louisiana CPL. Defendants deliberately withheld the information about the propensity of the defects to ensure that consumers would purchase the Class Vehicles.

339. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs Harang and Scott and the Louisiana Class members, about the true safety and reliability of Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

340. Defendants knew or should have known that their conduct violated the Louisiana CPL.

341. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the defects that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable", despite their knowledge of the defects or their failure to reasonably investigate them.

342. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the defects; allowed unsuspecting new and used car purchasers to continue to buy/lease the

Class Vehicles; and allowed those purchasers to continue driving dangerous and unreliable vehicles.

343.   Defendants owed Plaintiffs Harang and Scott and the Louisiana Class members a duty to disclose the true safety and reliability of the Class Vehicles and/or the defects because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs Harang and Scott and the Louisiana Class members; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs Harang and Scott and the Louisiana Class members that contradicted these representations.

344.   Because Defendants fraudulently concealed the defects in the Class Vehicles, a raft of negative publicity and thefts resulted once the defects were finally disclosed, and the value of the Class Vehicles was greatly diminished.

345.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the defects in Class Vehicles were material to Plaintiffs Harang and Scott and the Louisiana Class members.

346.   Plaintiffs Harang and Scott and the Louisiana Class members suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the defects that existed in the Class Vehicles, Plaintiffs Harang and Scott and the Louisiana Class members would have paid less for their vehicles or would not have purchased or leased the vehicles at all. Plaintiffs Harang and Scott and the Louisiana Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

347.    Defendants' violations present a continuing risk to Plaintiffs Harang and Scott, the Louisiana Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

348.    As a direct and proximate result of Defendants' violations of the Louisiana CPL, Plaintiffs Harang and Scott and the Louisiana Class have suffered injury-in-fact and/or actual damage.

349.    Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs Harang and Scott and the Louisiana Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

**2.    Count 12—Breach of the Implied Warranty of Merchantability/Warranty Against Redhibitory Defects (La. Civ. Code Art. 2520, 2524)**

350.    Plaintiffs Harang and Scott incorporate by reference all preceding allegations as though fully set forth herein.

351.    Plaintiffs Harang and Scott bring this claim on behalf of themselves and the Louisiana Class.

352.    When Plaintiffs Harang and Scott and the Louisiana Class members acquired their Class Vehicles, those vehicles had redhibitory defects within the meaning of La. Civ. Code Art. 2520, in that the Class Vehicles were rendered so inconvenient that Plaintiffs Harang and Scott and the Louisiana Class members either would not have purchased the Class Vehicles had they known of the defects, or, because the defects so diminished the usefulness and/or value of the Class Vehicles, they would have only purchased the Class Vehicles for a lesser price.

353.   Notice of the defects is required under La. Civ. Code Art. 2520, since Defendants had knowledge of the defects at the time they were sold to Plaintiffs Harang and Scott and the Louisiana Class members.

354.   Under La. Civ. Code Art. 2524, a warranty that the Class Vehicles were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Plaintiffs Harang and Scott and the Louisiana Class members purchased their Class Vehicles.

355.   Plaintiffs Harang and Scott and the Louisiana Class members relied on this warranty to their detriment.

356.   The Class Vehicles are not "merchantable" because they are not reasonably fit for the ordinary purpose for which they are sold, which is to provide safe, reliable transportation. To the contrary, the Class Vehicles pose a substantial safety hazard because the defects render them vulnerable to theft, making them prime targets to be used as instrumentalities of criminal activity.

357.   Defendants were provided notice of the defects by their knowledge of the Vehicles design, customer complaints, numerous complaints filed against them and/or others, internal investigations, and numerous individual letters and communications sent by consumers before or within a reasonable amount of time after the defects became public.

358.   As a direct and proximate result of Defendants' breach of these implied warranties, Plaintiffs Harang and Scott and the Louisiana Class members have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial. These damages include, but are not limited to, overpayment for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of Class Vehicles, increased insurance premiums, the loss of use of the Class Vehicles, costs associated with the replacement of the totaled Class Vehicles, and/or the diminution in value of the stolen Class Vehicles that were not totaled.

## IX.   **PRAYER FOR RELIEF**

359.   WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class members, respectfully request judgment against Defendants as follows:

        a.   certifying the proposed Nationwide Class and State Law Classes;

        b.   appointing Plaintiffs and their counsel to represent the Classes;

        c.   ordering injunctive relief, restitution, disgorgement, and/or other appropriate relief;

        d.   awarding compensatory, punitive, exemplary, and other recoverable damages;

        e.   awarding reasonable attorney's fees and expenses;

        f.   awarding pre-judgment and post-judgment interest;

        g.   awarding such other and further relief as this Court may deem just and proper.

## X.   **JURY TRIAL DEMAND**

360.   Plaintiffs demand a trial by jury of all issues so triable.

1    Dated: November 10, 2022           Respectfully submitted,

2

3                                James A. Morris, Esq.

4                                jmorris@jamlaywers.com

                               Shane E. Greenberg, Esq

5                                sgreenberg@jamlawyers.com

6                                **MORRIS LAW FIRM**

                               4001 Alameda Avenue, Suite 208

7                                Burbank, California 91505

                               Telephone: (747) 283-1144

8                                Facsimile: (747) 283-1143

9                                Warren T. Burns (to be admitted *pro hac vice*)

                               wburns@burnscharest.com

10                               **BURNS CHAREST LLP**

11                               900 Jackson St., Suite 500

                               Dallas, Texas 75202

12                               Telephone: (469) 904-4550

13                               Facsimile: (469) 444-5002

14                               Korey A. Nelson (to be admitted *pro hac vice*)

15                               knelson@burnscharest.com

                               Amanda K. Klevorn (to be admitted *pro hac vice*)

16                               aklevorn@burnscharest.com

17                               **BURNS CHAREST LLP**

                               365 Canal Street, Suite 1170

18                               New Orleans, LA 70130

19                               Telephone: (504) 799-2845

                               Facsimile: (504) 881-1765

20

21

22

23

24

25

26

27

28

62

**COMPLAINT AND JURY TRIAL DEMAND**

Jason M. Baer (to be admitted *pro hac vice*)
jbaer@baerlawllc.com
Casey C. DeReus (to be admitted *pro hac vice*)
cdereus@baerlawllc.com
Joshua A. Stein (to be admitted *pro hac vice*)
jstein@baerlawllc.com
**BAER LAW, LLC**
3000 Kingman Street, Suite 200
Metairie, LA 70006
Telephone: (504) 372-0111
Facsimile: (504) 372-0151

**COMPLAINT AND JURY TRIAL DEMAND**

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, James A. Morris, declare as follows:

1.      I am counsel for Plaintiffs, and I am the owner of Morris Law Firm.  I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.      The complaint filed in this action is filed in the proper place for trial because the Defendants transact substantial business in this district and because Hyundai Motor America and Kia America, Inc. are headquartered in this district. A substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.


I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on November 10, 2022, at Burbank, California.


_____

James A. Morris, Jr.

**COMPLAINT AND JURY TRIAL DEMAND**